UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

MILWAUKEE GAY ARTS CENTER INC.,

        Plaintiff,

        v.                                    Case No. 08-C-0958

CITY OF MILWAUKEE,
JOHN D. KALTENBRUN,
ROBERT STELTER,
CHESTER R. ULICKEY,

        Defendants.

---

DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. # 15) AND SETTING STATUS CONFERENCE

Plaintiff Milwaukee Gay Arts Center, Inc., moves for partial summary judgment on the ground that Milwaukee Ordinance § 83-1 is a facially unconstitutional prior restraint on free speech. However, the court need not reach this argument inasmuch as plaintiff has not persuaded this court that it has standing to proceed on a facial challenge.[1] Hence, plaintiff's motion for partial summary judgment will be denied.

Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment

---

[1] Recently, the court struck the plaintiff's first amended complaint because it was filed without the consent of the defendants or a motion for leave to file the amended complaint. On March 23, 2010, plaintiff filed a motion for leave to file an amended complaint but defendants have not had an opportunity to respond. Thus, the court is proceeding on the operative, initial complaint and the properly filed documents.

as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Findings of Fact

Plaintiff, Milwaukee Gay Arts Center, Inc., is a Wisconsin corporate entity with the capacity to sue and be sued in this court. (Answer ¶ 3.) Its principal offices are located at 703 South Second Street, Milwaukee, Wisconsin 53204. (Answer ¶ 3.) Defendant, the City of Milwaukee, is a Wisconsin municipal corporation duly constituted under the laws of Wisconsin with the capacity to sue and be sued in this court. (Answer ¶ 4.)

Plaintiff is recognized as a nonprofit charitable organization under § 501(c)(3) of the Internal Revenue Code § 501(c)(3). (Answer ¶ 3.) Its website describes its mission as follows:

> The Milwaukee Gay Arts Center's (MGAC) primary purpose is to serve and promote the betterment of the Milwaukee LGBT community through providing a safe, secure and friendly environment for LGBT artists to express, display and perform LGBT relevant visual and performing arts as well as provide arts related educational opportunities.

2

(http://www.milwaukeegayartscenter.org/mgac_abouthtml, last accessed July 4, 2009.)

In 2005, Ronald Mark Hooker was the creative director of an entity known as the "Uncommon Theater," which produced shows for various Milwaukee area venues, including the Milwaukee Gay Arts Center. (Hooker Aff. ¶ 2.) In the spring of 2005, Don Hoffman, Executive Director of the Milwaukee Gay Arts Center, asked Hooker to produce the musical, *Naked Boys Singing.* (Hooker Aff. ¶ 3; Hoffman Decl. ¶¶ 9-11.) The show is a musical satire with a gay theme and is performed traditionally with an all male cast of five to eleven actors who are nude on stage during most of the show. (Hooker Aff. ¶ 3.) By May 10, 2005, Mr. Hooker had obtained the production rights for the show, for the period of August 12, 2005, to September 4, 2005, and paid the required $900. (Hooker Aff. ¶ 4, Ex. 1.)

On August 3, 2005, Don Hoffman applied for a theater license under Milwaukee Ordinance ¶ 83-1, as required of profit making theaters, paid the licensing fee, and obtained a copy of the application and receipts verifying payment. (Answer ¶ 11; Grill Aff., ¶ 2, Ex. 1.) Relevant provisions of Chapter 83 of the Milwaukee Code of Ordinances provide as follows:

> 83-1. Theaters and Moving Picture Houses.
>
> 1. Definitions . . . .
>
>    b. "Theater" as used in this section means any edifice, or parts thereof, used for the purposes of dramatic or operatic or other exhibitions, plays or performances for admission to which remuneration or any other consideration is paid, charged or received.
>
> 2. LICENSE REQUIRED. No person, firm or corporation, as owner, lessee, manager, officer or agent, shall keep, maintain, conduct or operate for gain or profit, any theater or moving picture house in the

city without first obtaining a license therefore in the manner hereafter provided. A license shall not be required if the theater or moving picture house is kept, maintained, conducted or operated solely for the benefit of an under the supervision of a religious, educational or charitable organization . . . .

4. INVESTIGATIONS TO BE MADE. Applications for such license shall be referred to the common council and to the commissioner of neighborhood service, who shall cause an investigation to be made of the premises to be licensed and report the findings to the utilities and licenses committee of the common council as soon as possible.

5. GRANTING AND DENIAL OF LICENSES.

   a. Granting of licenses. Whenever the common council shall grant any such license, the city clerk shall give to the person, firm or corporation applying therefore a license, and such license shall be signed by the city clerk, and shall be sealed with the corporate seal of the city, and the city clerk shall keep a record thereof, and no such license shall be issued until the person apply for the same shall present to the city clerk the city treasurer's receipt for the payment to the city of the license fee hereinafter provided for.

   b. License Requirements. The application for license shall be granted when the following requirements are met: the building, structure or premises for which the license is sought must conform in all respects to the provisions of this section and the laws of this state and the ordinances of the city applying to such buildings, structure, or premises.

(Olson Decl., Ex. A.)

The Milwaukee Common Council's schedule of regular meetings and committee meetings is published in advance and available at the City's website: www.city.milwaukee.gov. (Owczarski Aff., Ex. 1; Grill Aff. ¶ 11.) Since 1969, it has taken a recess for the month of August. Hoffman applied for a theater license while the Milwaukee Common Council was on its August recess. (Owczarski Aff. ¶ 2.)

On August 5, 2005, the City of Milwaukee's License Investigation Unit received an anonymous complaint regarding the production of *Naked Boys Singing*. (Answer ¶ 9.) *Naked Boys Singing* started as planned and ran Thursday, August 11, Friday, August 12, and Saturday, August 13, 2005, at the Milwaukee Gay Arts Center, 703 South 2nd Street in the City and County of Milwaukee. (Hooker Aff. ¶ 5.) Hoffman did not advise Hooker that Milwaukee Gay Arts Center needed a theater license or that he first applied for a license on August 3, 2005, and had not received a license from the City of Milwaukee. (Hooker Aff. ¶ 6.) After the August 13, 2005, presentation of *Naked Boys Singing*, the next intended presentation was for the evening of August 18, 2005. (Hooker Aff. ¶ 7.)

On August 15, 2005, the Milwaukee Gay Arts Center was contacted by police detectives from the Vice Control Division, under the direction of Lt. John Kaltenbrun, regarding the Center's licensing status. (Answer ¶ 11; Hooker Aff. ¶ 8.). Two officers of the Milwaukee Police Department (one a detective) talked with Hoffman and Hooker and were informed that a theater license had been applied for, that the fee was tendered on or about August 3, 2005, but that the license had not been received from the Milwaukee Common Council. Copies of the applications and receipts along with other licenses and certificates were shown to the officers at that time. (Answer ¶ 11.)

Lt. Kaltenbrun confirmed the application with City Hall but learned that the Milwaukee Common Council would not convene to act on the application until September of 2005. (Answer ¶ 12.) On August 18, 2005, officers of the Milwaukee Police Department, one of whom was detective, contacted Hooker and told him that if the production of *Naked Boys Singing*, took place without a theater license, citations and

5

arrests could be made for the reason that no theater license had been issued to the plaintiff. (Answer ¶ 13.) No one from the Milwaukee Police Department indicated that *Naked Boys Singing* could not be performed because of the show's nudity or gay content. The only reason given was that the Milwaukee Gay Arts Center needed a theater license and did not have one. (Hooker Aff. ¶ 9.)

Hooker contacted Hoffman on his cell phone. Hoffman told him that he had applied for a theater license, that it had not been granted, but the theater was allowed to operate in the meantime. Because the Milwaukee Gay Arts Center did not have a theater license, and following consultation with Attorney Larry DuPuis, Hooker decided to not run the show until the theater license had been procured. (Hooker Aff. ¶ 11.)

By cell phone on August 18, 2005, Hoffman encouraged Hooker to close the show and to hold a press conference instead. Hooker did so on that date. Hoffman stated that he was extremely happy that they closed the show due to the free publicity it generated by being "closed" by the Milwaukee Vice Squad. (Hooker Aff. ¶ 12.) The show's closing resulted in publicity in the form of media attention in the conventional and gay press, interviews on National Public Radio, the appearance of well know personalities connected with the show and internet attention. (Hooker Aff. ¶ 13.)

On the night of August 18, 2005, Lt. Kaltenbrun ordered several detectives and other police officers to go to MGAC to ascertain whether MGAC was going ahead with the performance scheduled for that night, and to issue citations if it was. (Answer ¶ 15.) Lt. Kaltenbrun ordered an officer to go to MGAC undercover on the evening of August 18, 2005, to purchase a ticket to *Naked Boys Singing*. (Answer ¶ 15.)

Upon arriving at MGAC on the evening of August 18, 2005, the officers learned that the night's production of the play had been cancelled. (Answer ¶ 15.) The director of *Naked Boys Singing* had cancelled the August 18, 2005, performance due to threats of arrests and fines. (Hoffman Decl., ¶ 24.)

On August 25, 2005, the License Division Manager, Rebecca Grill, learned that the Milwaukee Gay Arts Center, Inc., was potentially an organization holding tax exempt status under the provisions of Section 501(c)(3) of the Internal Revenue Code on August 25, 2005, by investigating information that Don Hoffman submitted with an August 8, 2005, application for a temporary Class "B" malt liquor license. (Grill Aff. ¶¶ 5-7.) Grill sought advice from the Office of the City Attorney on that question, and then contacted Hoffman relative to the charitable organization exemption, following up that communication with a letter dated August 26, 2005. (Grill Aff. ¶ 7.) The letter advised Hoffman that no theater license requirement is imposed if the organization operating the theater is a tax exempt charitable organization. (Grill Aff., Ex. 8.)

On September 7, 2005 (the next regularly scheduled meeting of the Common Council), the Milwaukee Gay Arts Center's theater license application was granted as a matter of course. The license was not issued, however, because the Milwaukee Gay Arts Center was exempt from the theater license ordinance as a charitable organization. (Grill Aff. ¶ 15.)

The Uncommon Theater resumed its production of *Naked Boys Singing* at the Milwaukee Gay Arts Center, Inc., in late October of 2005, after rescheduling actors and securing rights for a second run. (Hoffman Decl., ¶¶ 27, 29; Hooker Aff. ¶ 14.) Milwaukee police officers were not antagonistic to the show; rather, they provided police services to

protect the cast and crew from anti-gay protesters who continued to gather in protest of the production. (Hooker Aff. ¶ 14.)

Theater license applications are processed by the City's License Division as follows: The License Division notifies Department of Neighborhood Services (DNS) on the next business day following receipt of an application. DNS is expected to check its records to determine if the premises or building in question has the appropriate occupancy permit or certificate, has any outstanding building code violations and if the use for the location complies with the zoning requirements. (Grill Aff. ¶ 9.) If the applicant has cleared the DNS objection by obtaining the occupancy permit, or correcting the code violation, the license will be granted at that next meeting and the license will be issued immediately. If the applicant has not corrected the violation or obtained the occupancy permit, the license will be granted at that next meeting, but not issued until applicant has in fact rectified and cleared the objection. (Grill Aff. ¶ 9.) The time period between application and issuance depends upon the applicant's promptness in correcting code violations and/or satisfying occupancy permit requirements. A zoning objection must be resolved by the Board of Zoning prior to the license being granted or issued. (Grill Aff. ¶ 9.)

DNS acts upon license applications in the following manner: The License Division notifies NDS of the application electronically and DNS prints copies of the same at its printer. (Wessel Aff. ¶ 4.) Within 1 to 5 business days, DNS checks the City's records of the proposed location to determine whether the applicant has an appropriate occupancy permit for the license in question; whether the building or premises has outstanding code violations; and whether the address is zoned for the intended use. (Wessel Aff. ¶ 4.) If the foregoing checks are in order, DNS promptly notifies License

8

Case 2:08-cv-00958-CNC   Filed 03/26/10   Page 8 of 15   Document 41

Division that it has no objections to the application. (Wessel Aff. ¶ 4.) If the foregoing checks demonstrate a deficiency or a problem, DNS promptly notifies License Division of those specific objections. (Wessel Aff. ¶ 8.) Then, the License Division notifies the applicant of the objections, if any. (Wessel Aff. ¶ 4.)

The applicant is required to contact the appropriate entity to resolve the objection: for example, failure to have an occupancy permit will require the applicant to apply for the permit at the Department of City Development; the presence of an outstanding building code violation may require the applicant to cure the code violation and obtain an inspection and clearance from the applicable section (electrical, plumbing, etc.) of DNS; objections based on zoning require the applicant to apply for special use or other exceptions with the Board of Zoning. (Wessel Aff. ¶ 4.) In the case of occupancy permits and building code issues, when the applicant has resolved the outstanding issue, DNS promptly reports that result to the License Division. With respect to zoning issues, the Board of Zoning notifies the License Division of its outcome. (Wessel Aff. ¶ 4.)

No portion of the application or licensing process requires disclosure of the contents or nature of any shows, movies, plays or presentations that may be performed at the proposed theater. (Grill Aff. ¶ 12.) Also, no discretion is exercised by the License Committee or Common Council relative to granting or denying a theater license based on the content of any show, movies, play, presentation or performance which has or may be presented by the applicant. Further, no consideration is given to the ideology, ethnicity or sexual orientation of the applicant; rather, the license is granted or denied as a matter of course based upon the building or premises satisfying the requirements of Section 83-5b as to the building's compliance with the Milwaukee Code of Ordinances. (Grill Aff. ¶ 13.)

9

Moreover, DNS is not informed, and does not inquire about the content of the applicant's business, product or production, or the ideology, ethnicity or sexual orientation of the applicant or its clientele. (Wessel Aff. ¶ 5.) The sole criteria for DNS to state any objection to a license application is whether or not the building or premises complies with the requirements of the Milwaukee Code of Ordinances and the Building Code. (Wessel Aff. ¶ 5.)

Conclusions of Law

This court has an obligation to ensure its own jurisdiction. *See FW/PBS.Inc. V. City of Dallas*, 493 U.S. 215, 231, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990) (citing *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984). As such, parties seeking to invoke the jurisdiction of federal courts must show that they have standing to sue within the meaning of Article III. *Krislov v. Rednour*, 226 F.3d 851, 857 (7th Cir. 2000). Standing requires that a plaintiff must suffer an injury in fact, defined as "an invasion of a legally protected interest which is . . . concrete and particularized and actual or imminent . . . .'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992). Standing on one claim does not confer standing on all claims. A plaintiff must properly allege an injury for each claim asserted. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006)(*citing Allen v. Wright*, 468 U.S. 737, 752, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)).

The undisputed facts establish that the ordinance at issue – on its face – does not apply to the plaintiff. Plaintiff is a non-profit charitable organization and Milwaukee Ordinance § 83-1 applies to theaters operating for profit. Indeed, the relevant language reads unambiguously:

10

> [n]o person, firm or corporation, either as owner, lessee, manager, officer or agent, shall keep, maintain, conduct or operate for gain or profit, any theater or moving picture house in the city without first obtaining a license therefor in the manner hereinafter provided. A license shall not be required if the theater or moving picture house is kept, maintained, conducted or operated solely for the benefit of and under the supervision of a religious, educational or charitable organization.

Notwithstanding plaintiff's acknowledgment that it is a charitable organization, it applied to the City Clerk for a license and paid the licensing fee on August 3, 2005.

Two days after the plaintiff did so, the City of Milwaukee's License Investigation Unit received an anonymous complaint regarding the production of *Naked Boys Singing*. Police detectives first contacted the plaintiff on August 15, 2005, at which time the plaintiff informed the detectives that it had applied for a license. For a short time thereafter, the police and the plaintiff proceeded under the mistaken belief that the ordinance applied until the City's licensing unit determined that the plaintiff is a charitable organization and not a profit making venture. The mistaken assumption of the plaintiff and police does not mean that, as a matter of law, Milwaukee Ordinance 83-1 did or ever will apply to this plaintiff. Rather, the evidence in this record is that the City License Division Manager learned that plaintiff was an organization holding exempt status under the provisions of Section 501(c)(3) of the Internal Revenue Code on August 25, 2005, by investigating information that Don Hoffman submitted on behalf of the plaintiff with an August 8, 2005, application for a temporary Class "B" malt liquor license. Rebecca Grill, of the City's License Division, contacted Hoffman to inform him that there was no theater license requirement for plaintiff because it is a tax exempt charitable organization.

11

The court is mindful that laws that are written broadly have the potential to chill the expressive activity of parties who are not involved directly in a case or controversy before the court. Hence, there are exceptions to the requirement that standing be shown in the context of the First Amendment. Some laws may be subject to facial challenges even if their application in the case under consideration may not be constitutionally objectionable. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129, 112 S. Ct. 2395, 120 L. Ed. 2d 101(1992), *overruled on other grounds by City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 124 S. Ct. 2219, 159 L. Ed. 2d 84 (2004). Facial challenges are permitted where a licensing scheme vests discretion in the decision maker. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. at 223. As explained by the Seventh Circuit Court of Appeals, challenges of this type are permitted because such schemes enable officials to self-censor protected expression. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1044 (7th Cir. 2002).

In *Lakewood,* the United States Supreme Court set forth the test to determine when a First Amendment facial challenge may be made to a licensing scheme. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755-56, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1998). First, a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers. *Id.*, 486 U.S. at 759. Second, the law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of identified censorship risks. *Id.* Significantly, the court wrote that one *who is subject to the law* may

challenge it facially when the licensing statute allegedly vests unbridled discretion in a government official. *Id.*, 486 U.S. at 755 (emphasis added).

Consistent with *Lakewood*, the plaintiff alleges that Milwaukee Ordinance § 83-1 is invalid because it permits unbridled discretion on the part of City authorities as to which establishments need apply for a license. In addition, it argues that the ordinance is invalid to the extent it operates as a prior restraint. However, these allegations alone do not confer standing. "[I]t is a long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings but must affirmatively appear in the record." *FW/PBS, Inc. V. Dallas*, 493 U.S. at 231. The party who seeks the exercise of jurisdiction in his favor has the burden of clearly alleging facts "demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Id.*

Unlike the plaintiff in *Lakewood*, plaintiff applied for a license under an ordinance that on its face shows that it is inapplicable to charitable organizations. The parties agree that plaintiff applied for the license, representatives of the plaintiff told detectives that the plaintiff had applied for a license, and the same representatives after consulting with the plaintiff's attorney, made the decision to cancel the show due to the fear of fines or arrest if the scheduled performance proceeded without a license.

Further, no facts suggest that plaintiff communicated its non profit status to the detectives who were following up on an anonymous complaint. The City's License Division Manager, who is not a defendant, did not learn that plaintiff is an exempt organization until she reviewed the plaintiff's separate application for a temporary Class B malt liquor license. No facts suggest that the named detectives, who are not involved with licensing decisions, were shown the ordinance, reviewed the ordinance, or that the

13

ordinance was ever eyeballed by anyone concerning this matter before the City License Division Manager reviewed the plaintiff's request for a temporary liquor license. This is not to say that plaintiff does not have standing to pursue other claims against a party who mistakenly or willfully attempted to enforce an ordinance that does not apply. However, plaintiff has no standing to challenge Milwaukee's theater ordinance on its face.

To the extent that plaintiff's standing argument rests on the theory that the government officials have unbridled discretion under this ordinance, the evidence before this court suggests otherwise. The ordinance provides criteria for issuing a theater license unrelated to the content of any play or performance. Indeed, the ordinance applies to all "for profit" theaters and moving picture houses without exception. Neither the application nor licensing process of Milwaukee Ordinance 83-1 requires disclosure of the contents or the nature of any shows, movies, plays or performances at a profit making live theater or movie house. The sole criteria for objection to a license application is whether the building complies with the building code. Specifically, all license applications are referred to the Milwaukee Common Council and the commissioner of neighborhood service, who investigate the premises and report the findings to the utilities and licenses committee. The license shall be granted when the building, premises or structure conforms to the city ordinances applicable to such buildings, structure, or premises. It does not say that a license *may* be granted – it "shall" be granted. Therefore, the underlying concerns in *Lakewood* that the unbridled discretion vested in government officials will allow these officials to self censor does not apply here. Now, therefore,

IT IS ORDERED that plaintiff's motion for partial summary judgment is denied.

14

IT IS FURTHER ORDERED that this matter is set for a status conference on April 13, 2010, at 10:15 AM.

Dated at Milwaukee, Wisconsin, this 26th day of March, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE